UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, AIRLINE DIVISION, *et al.*,

                Plaintiff,

    v.

ALLEGIANT AIR, LLC,

                Defendant.

Case No. 2:21-cv-00374-KJD-DJA

ORDER

Presently before the Court is Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction (#5). Plaintiffs filed a response in opposition (#12) to which Defendant replied (#14).

I. Background

**A. The Parties and their Collective Bargaining Agreement**

Allegiant is an airline headquartered in Las Vegas, Nevada, and is an "air carrier" within the meaning of Section 201 of the RLA, 45 U.S.C. § 181. In August 2012, the National Mediation Board ("NMB") certified IBT as the collective bargaining representative of Allegiant's pilots under the RLA. IBT has delegated its day-to-day representation responsibilities to Local 2118. On August 1, 2016, Allegiant and the IBT entered into the CBA. As required by Section 204 of the RLA, 45 U.S.C. § 184, the CBA establishes a System Board of Adjustment ("SBA"), which is the name for an arbitral tribunal in the airline industry. The CBA likewise establishes procedures that must be followed before a claim may be advanced to arbitration. When these requirements have not been followed, the SBA is without jurisdiction to consider the dispute.

**B. PBS and the Related Litigation**

The dispute that gave rise to this case relates to the way Allegiant builds monthly work schedules for its pilots. Specifically, it concerns how those schedules are created on particularly busy days that are a result of Allegiant's unique business model as a low-cost carrier providing leisure travel to underserved markets.

Because Allegiant must operate when its customers are interested in flying for leisure purposes (weekends, holidays, and during the summer), Allegiant's schedules have very heavy flying on some days of the week, and very little to no flying on others. As a result of these fluctuations, on certain days, virtually every pilot who is available and legal to work at a base may be required to do so. These are referred to as "Must Work Days."

Prior to 2014, Allegiant used "line bidding" to create schedules for its pilots. Under that system, the Company determined what flying it planned to do in a particular month and then built "lines of flying" consisting of specific flight assignments (also known as "trip pairings") or reserve assignments (where a pilot is on "stand-by" to fill in when flights become uncovered on short notice), and days off. Pilots would then bid on those existing lines of flying, which would be awarded in seniority order. Line bidding worked well with Allegiant's model because the Company could build lines that ensured adequate coverage on its busiest days. In 2014, however, the Federal Aviation Administration modified the Federal Aviation Regulations ("FAR") regarding pilot hours of service and rest periods. As a result, in January 2014, Allegiant moved from line bidding to a preferential bidding system ("PBS").

Under PBS, pilots are not limited to bidding on the lines of flying the airline has created. Instead, they express preferences for the type of work they would like to do in a particular month. This may include such things as what days of the month they would like to – or not to – work, what times on a particular day they would prefer to work, whether the pilot would prefer to fly trip pairings or reserve duty, among others. The PBS creates a schedule that gives the pilot as many of his or her preferred assignments as possible, taking into account regulatory and contractual restrictions (which are referred to as "legalities"), the preferences of more senior pilots, and the Company's operational needs. While PBS attempts to provide each pilot

1   assignments that match their preferences, it is universally understood that PBS does not

2   guarantee that pilots will receive all of their preferred assignments throughout a month, or their

3   first choice on any particular day. For instance, a pilot may not receive a preferred assignment

4   because a more senior pilot had already been awarded it, or because the pilot is prohibited from

5   receiving the assignment as a result of regulatory or contractual legalities.

6        To create pilot schedules under PBS, Allegiant utilizes a computer system, commonly

7   referred to as the "solver." This system constructs schedules for the upcoming month, taking into

8   account the work assignments that Allegiant must staff for a particular month, any preplanned

9   events (such as vacation or training) that make a pilot unavailable to work on a given day, the

10   contract and FAR legalities, and each pilot's seniority and preferences. While some aspects of

11   Allegiant's PBS have changed over time, two aspects had remained constant. First, there have

12   always been Must Work Days at Allegiant. Second, the solver always assigned work on those

13   days first when creating pilot schedules. This meant that on a Must Work Day, the solver would

14   assign a work assignment on that day for each legal and available pilot before creating their

15   schedules for the other days of that month.

16        The change from line bidding to PBS, which came while the parties were still in the

17   process of negotiating their initial CBA, was hotly contested. The Union sued to enjoin the

18   switch to PBS and sought to require Allegiant to return to line bidding, under the theory that the

19   change violated the RLA's "status quo" obligations. See Int'l Bhd. of Teamsters, Airline Div. v.

20   Allegiant Air, LLC ("Allegiant I"), No. 2:14–cv–00043–APG–GWF, 2014 WL 3653455, at *1

21   (D. Nev. July 22, 2014) (Gordon, J.), rev'd, 788 F.3d 1080 (9th Cir. 2015). Judge Gordon

22   initially agreed with the Union's "status quo" argument. He declined, however, to enjoin

23   Allegiant from using PBS, as that "would cause major disruptions to Allegiant's flight

24   operations." Instead, he issued a limited injunction requiring Allegiant to modify its PBS "to

25   better respect pilot seniority and to provide greater transparency and predictability for the pilots."

26        Allegiant appealed that decision to the Ninth Circuit. While that was pending, Allegiant

27   complied with the injunction by modifying the PBS as the Court had ordered. The Union,

28   however, was not satisfied with the steps Allegiant took, and threatened to strike. Allegiant Air,

1   LLC v. Int'Bhd. of Teamsters, Airline Div. ("Allegiant II"), No. 2:15–CV–00580–APG–GWF,

2   2015 WL 1994779, *1-2, 4 (D. Nev. May 1, 2015) (Gordon, J.). Allegiant moved to enjoin the

3   strike, and Judge Gordon issued an order enjoining the Union from striking. Allegiant II, 2015

4   WL 1994779, at *4. Shortly thereafter, in June 2015, the Ninth Circuit concluded that the district

5   court had improperly entered the status quo injunction against the airline in Allegiant I, and

6   vacated that order. See Int'l Bhd. of Teamsters, Airlines Div. v. Allegiant Air, LLC, 788 F.3d

7   1080, 1093 (9th Cir. 2015). As a result of these decisions, Allegiant won the ability to continue

8   using Must Work Days and to solve those days first when creating pilot schedules.

9          At the same time Allegiant was defending its scheduling system in the courts, it was

10  negotiating with the Union over the parties' first CBA, including with respect to pilot scheduling.

11  During those negotiations, the Company repeatedly told the Union that it would not agree to any

12  provisions that would require it to change how it scheduled on Must Work Days, and that it did

13  not understand any of the terms on which the parties' agreed to have that affect. Ultimately, the

14  parties were unable to reach agreement during bargaining as to the specifics of a new PBS.

15  Rather than delay the rest of the CBA from going into effect, the parties agreed to address PBS

16  through a Letter of Agreement ("LOA") they would negotiate after the CBA had been

17  implemented. The CBA became effective on August 1, 2016, and Section 15.A.9 provided time

18  lines for the process of negotiating the PBS LOA.

19         The PBS LOA negotiations ultimately proved unsuccessful. In 2018, the Union

20  unilaterally terminated those negotiations and again threatened to strike. Allegiant again moved

21  to enjoin the threatened strike on the ground that it violated the RLA. After Magistrate Judge

22  Koppe denied the Union's motion to dismiss that lawsuit, the Union agreed to a stipulated

23  permanent injunction barring its threatened strike. Further, the parties entered into a settlement

24  agreement to resolve that litigation. As part of that agreement, the Union agreed to withdraw any

25  claims related to Section 15.A.9 or the PBS LOA "with prejudice."

26         **C. The Union's Initial PBS Claims and the Arbitration Before Richard Bloch**

27         That was not the end of the PBS saga. In March 2018, the Union began filing dozens of

28  grievances over PBS. In August 2018, the Union advanced a number of those claims to

- 4 -

1    arbitration. The parties chose Arbitrator Richard Bloch to hear those grievances as the neutral

2    member of the three-person SBA. After a five-day hearing, Arbitrator Bloch ruled that while

3    Allegiant could continue to use Must Work Days in creating pilot schedules, it could not solve

4    those days first – i.e., out of a pilot's sequential preference order.

5            On October 7, 2020, Allegiant filed a lawsuit to vacate the Bloch award pursuant to

6    Section 3, First (q) of the RLA, 45 U.S.C. § 153, First (q). (Complaint, Allegiant Air, LLC v.

7    Int'l Bhd. of Teamsters, Airline Div., No. 2:20-cv-01866-APG-DJA (ECF No. 1).) Particularly,

8    Allegiant claimed that Arbitrator Bloch exceeded his jurisdiction because the award is contrary

9    to the CBA's express terms; that he acted outside his authority by ignoring the undisputed facts

10   and by instead applying his own sense of industrial justice; and that the award violated

11   Allegiant's right to due process. The Union filed a counterclaim in which it alleged that Allegiant

12   has refused to comply with the award, and sought an order from the Court enforcing that award.

13   That case was assigned to Judge Gordon.

14           In that case, the parties sought – and the Court granted – permission to forgo discovery

15   and expeditiously resolve their claims through dispositive briefing. The purpose of that

16   accelerated process was to allow that matter to be resolved before the parties were required to

17   address the Union's new PBS claims that are at the heart of this case. That case was finally

18   resolved on March 10, 2022, when Judge Gordon entered an order denying Allegiant's motions

19   to dismiss and for summary judgment and granting the Union's motion to enforce the arbitration

20   award.

21           **D. The Present Action: The Union's New PBS Claims and Allegiant's Offer to**

22           **Arbitrate**

23           Not long after the Bloch award became final, the Union began alleging that the changes

24   Allegiant made to comply with it violated that decision and the CBA. In response, on October 9,

25   2020, Allegiant wrote to the Union stating that those claims should be held in abeyance until

26   Allegiant's lawsuit to vacate the Bloch award is resolved because its outcome would have a

27   direct effect on whether the Union's new PBS claims could be heard. The Union responded to

28   that letter by again demanding that Allegiant select an arbitrator to hear its new claims – without

addressing the Company's point that those claims should be held in abeyance. Allegiant
responded that the Union's request was improper under the terms of the CBA, as well as
reiterating its position that the claims should be held in abeyance until the pending lawsuit is
decided.

Over the following months, the parties repeated this process. From time-to-time, the
Union would demand that Allegiant join in selecting an arbitrator to hear some unspecified
number of its new PBS claims – ignoring the procedural and jurisdictional defects that the
Company had pointed out in its previous correspondence – and Allegiant would respond that the
request was improper.

The Union's January 6, 2021, letter identified in its Complaint, is no exception. See
Compl. ¶ 18. In that letter, the Union asked that Allegiant agree to an arbitrator, and to stipulate
that any decision rendered by that arbitrator would apply to the other new PBS claims. Id., Ex.
15 ("Grievances filed by other similarly situated pilots will be covered by this grievance."); see
also id., Ex. 13 at 1 n.1 (repeating request that Allegiant select an arbitrator, whose decision
would cover all "[g]rievances filed by similarly situated pilots")). Allegiant responded that this
request was improper. The Company explained that the Union's request represented "yet another
attempt to circumvent the collective bargaining agreement's clear rules regarding the
combination of claims" and was therefore "rejected." Id., Ex. 16 at 2. Furthermore, it pointed out
that "[t]he litigation over Mr. Bloch's award is currently pending and the resolution of that
litigation may very well impact the Union's new PBS claims – including by potentially rendering
them moot." Id. Accordingly, progressing the Union's new claims "before the court has
considered Allegiant's petition would be a waste of resources and is premature." Id. It thus
declined to agree to the Union's proposed arbitrator at that time.

Rather than address those issues, on January 27, 2021, the Union again demanded that
Allegiant agree to an arbitrator for the new PBS claims. Particularly, it asserted that Allegiant
had no right "to refuse the CBA obligations to select an arbitrator on the new PBS II grievances
and Grievance No. 3586," and threatened that if Allegiant did not accede to the Union's demands
within 10 days, it would file a lawsuit. Id., Ex. 17.

1       On February 8, 2021, Allegiant responded to that demand. Id., Ex. 18. In its letter, the

2   Company rebutted the Union's contention that the new claims were unrelated to Arbitrator

3   Bloch's award, observed that aspects of the new claims were barred by the parties' settlement

4   agreement entered into during the 2018 litigation over the Union's threat to strike, and pointed

5   out that the SBA lacked jurisdiction because the Union had failed to comply with the CBA's

6   grievance requirements. Id. at 1-2. Moreover, Allegiant corrected the Union's

7   mischaracterization that the Company was "refusing arbitration." Id. at 2. In particular, the

8   Company stated that:

9           [B]ecause it is beyond dispute that the new PBS claims are directly
            related to Arbitrator Bloch's award and the pending litigation, those
10          claims should be held in abeyance. Doing so will conserve the time
            and resources that may be wasted if the litigation renders the
11          Union's claims moot. The Union has never responded to this
            position. But in any event, Allegiant has never refused to arbitrate
12          claims that have been properly progressed under the terms of the
            parties' agreement. As noted above, however, Allegiant is not aware
13          of any new PBS claims that satisfy that criteria.

14  Id.

15      Nevertheless, and despite the Union's repeated failure to comply with the CBA's

16  grievance requirements, Allegiant specifically offered to arbitrate one of the Union's new PBS

17  claims. Allegiant proposed that the parties utilize the procedural neutral process enshrined in the

18  RLA to resolve disputes concerning the establishment and jurisdiction of arbitral panels:

19          [G]iven your insistence on progressing Grievance No. 3586 to
            arbitration, and pursuant to the Railway Labor Act's process for
20          resolving threshold procedural issues, Allegiant would agree to a
            procedural System Board that would resolve any and all threshold
21          procedural and jurisdictional questions. Those would include, but
            would not be limited to, whether the Union's new claim is precluded
22          in whole or in part by Arbitrator Bloch's award, the doctrines of
            issue preclusion and res judicata or the parties' settlement
23          agreement; whether the grievance is improper under the terms of the
            CBA; and/or whether the grievance should be held in abeyance
24          pending the resolution of the federal court litigation. The decision
            of the procedural System Board would be final and binding on the
25          parties. If the procedural System Board determines that the case may
            and should proceed, the parties would select a separate neutral
26          arbitrator to hear the matter on its merits under the System Board
            procedures in the CBA.
27

28  Id. at 2-3. Allegiant asked that the Union respond to this offer by February 22, 2021. Id. at 3. It

1  never did. Instead, on March 5, 2021, it filed the instant lawsuit.

2  II. Motion to Dismiss for Lack of Subject Matter Jurisdiction

3        Federal courts are courts of limited jurisdiction. A court thus should dismiss a claim

4  under Rule 12(b)(1) if the party asserting it fails to meet its burden of establishing subject-matter

5  jurisdiction. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) ("It is to be

6  presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the

7  contrary rests upon the party asserting jurisdiction"). In considering a motion under Rule

8  12(b)(1) that raises a factual attack on the court's subject-matter jurisdiction, the court "is not

9  restricted to the face of the pleadings, but may review any evidence, such as affidavits and

10  testimony, to resolve factual disputes concerning the existence of jurisdiction." McCarthy v.

11  United States, 850 F.2d 558, 560 (9th Cir. 1988).

12  III. Analysis

13        A. Applicability of the Railway Labor Act ("RLA")

14        Plaintiff concedes that the Labor Management Relations Act ("LMRA") is not the

15  operative statutory scheme in this action. Plaintiff points out and the Court recognizes that

16  Plaintiff also pled the correct statute that governs the relationship between Allegiant and the

17  Union, the Railway Labor Act, 45 U.S.C. § 185.

18        B. Union's Claim is a Minor Issue over which the Court Lacks Jurisdiciton

19        Whether a court has jurisdiction to resolve a dispute arising under the RLA depends on

20  the answer to a classification question; that is, whether the dispute is classified as "major" or

21  "minor." E.g., AFA v. Horizon Air Indus., Inc., 280 F.3d 901, 904 (9th Cir. 2002); BLET v.

22  Union Pac. R.R. Co., 879 F.3d 754, 757 (7th Cir. 2017).

23        Whether a dispute is "major" or "minor" does not turn on "the importance of the issue

24  presented." Consol. Rail Corp. v. Ry. Labor Execs. Ass'n ("Conrail"), 491 U.S. 299, 305 (1989).

25  Instead, "[m]ajor disputes relate to 'the formation of the collective bargaining agreements or

26  efforts to secure them.'" Saridakis v. United Airlines, 166 F.3d 1272, 1276 (9th Cir. 1999)

27  (quoting Felt v. Atchison, Topeka & Santa Fe Ry. Co., 60 F.3d 1416, 1419 (9th Cir. 1995)). If a

28  dispute is major, the RLA "requires the parties to undergo a lengthy process of bargaining and

- 8 -

1    mediation" before either party may resort to self-help, such as a strike. Conrail, 491 U.S. at 302-

2    303. Federal courts have jurisdiction to enforce the RLA's major dispute procedures. Id.; see

3    also, e.g., Elgin, Joliet & Eastern Ry. v. Burley, 325 U.S. 711, 723 (1945).

4         "In contrast, minor disputes 'involve controversies over the meaning of an existing

5    collective bargaining agreement in a particular fact situation.'" Saridakis, 166 F.3d at 1276

6    (quoting Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 253 (1994)). Minor disputes must be

7    resolved through arbitration by arbitral boards created by the RLA or the parties' contracts.

8    Conrail, 491 U.S. at 303; see also 45 U.S.C. §§ 153 First (i), 184. These panels have exclusive

9    jurisdiction over minor disputes, Conrail, 491 U.S. at 304, and courts lack jurisdiction to resolve

10   them. See, e.g., SMART-TD v. BNSF Ry. Co., 650 F. App'x 914, 916 (9th Cir. 2016)

11   (unpublished); Mesa, 567 F.3d at 1046-47; Horizon Air Indus., Inc., 280 F.3d at 906-07; IBT v.

12   Horizon Air Indus., Inc., No. C17-0121RSL, 2017 WL 1064393, at *2 n.3 (W.D. Wash. Mar. 21,

13   2017) ("Because the dispute is 'minor,' the Court lacks subject matter jurisdiction.")

14        The Union's Complaint asserts a single claim for "Breach of Written Collective

15   Bargaining Agreement." (Compl. at 3.) It alleges that in January 2021, the Union "requested

16   arbitration" over a grievance related to Allegiant's PBS, and that Allegiant has "declined to

17   participate in selecting an arbitrator to hear" that claim. Id. ¶¶ 18-19. This, the Union asserts,

18   amounts to "a violation of the CBA [] between Local 2118 and Allegiant." Id. ¶ 21.

19        On its face, this is clearly a minor dispute. As the Supreme Court observed in Atchison,

20   Topeka & Santa Fe Railway Co. v. Buell, 480 U.S. 557 (1987), where a "claim [is] based

21   squarely on an alleged breach of the collective-bargaining agreement . . . Congress had intended

22   the RLA dispute resolution mechanism to be mandatory for that type of dispute, and . . . courts

23   [ar]e therefore foreclosed from addressing" it. Id. at 566; see also, e.g., Ertle v. Cont'l Airlines,

24   Inc., 136 F.3d 690, 693 (10th Cir. 1998) (claims are minor disputes where they "actually [arise]

25   in some manner from a breach of the defendants' obligations under a collective bargaining

26   agreement").

27        The Union's Complaint leaves no doubt that its claim alleges a breach of the CBA. Not

28   only has the Union expressly framed its claim as one for "breach" of the CBA, but the majority

of its allegations recite provisions from that agreement. As such, the Court need not look any

further than to the Union's own allegations, which make clear that this lawsuit is "based squarely

on an alleged breach of the collective-bargaining agreement" and is thus a minor dispute.

Atchison, Topeka & Santa Fe Ry. Co., 480 U.S. at 566. Because this is the case, the Court lacks

subject-matter jurisdiction over the Union's claim. See, e.g., AFA-CWA v. Spirit Airlines, Inc.,

No. 2:12-CV-15641, 2013 WL 1858754, at *3 (E.D. Mich. May 2, 2013) (granting carrier's

"facial" jurisdictional challenge and dismissing claim as a minor dispute based on the union's

pleadings). Accordingly, the Court dismisses Plaintiff's complaint for lack of subject matter

jurisdiction.[1]

IV. Conclusion

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss for Lack

of Subject Matter Jurisdiction (#5) is **GRANTED**.

Dated this ___30th___ day of March, 2022.

Kent J. Dawson
United States District Judge

---

[1] The Court finds that Plaintiff has failed to show that the "grievance repudiation exception" applies. The Union has not made a showing that "the pursuit of an administrative remedy [is] truly impossible." Pyles v. United Air Lines, Inc., 79 F.3d 1046, 1052 (11th Cir. 1996).